

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/24/2007

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **LINO SANCHEZ and** | § | **Case No. 02-45416** |
| **MARY SANCHEZ** | § | |
| | § | |
| Debtors | § | |
| | § | |
| **LINO SANCHEZ and** | § | |
| **MARY SANCHEZ,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **V.** | § | |
| | § | **Adversary No. 06-3671** |
| **AMERIQUEST MORTGAGE** | § | |
| **COMPANY,** | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## MEMORANDUM OPINION ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. Introduction

The American bankruptcy system is often described as having two primary objectives: first, ensuring the equitable and timely repayment of creditors with valid claims; and second, affording debtors a fresh start once they emerge from bankruptcy. *In re Ortiz*, No. 05-39982, 2006 WL 2946500, at *9 (Bankr. S.D. Tex. Oct. 13, 2006) (quoting *In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997)). In order for these twin goals to be achieved—indeed, in order for the bankruptcy system to function—every entity involved in a bankruptcy proceeding must fully disclose all relevant facts. *In re Coastal Plains, Inc.*, 179 F.3d

197, 208 (5th Cir. 1999) ("The duty of disclosure in a bankruptcy proceeding is a continuing one."); *In re Ramirez*, No. 03-47872, 2006 WL 3838176, at *3 (Bankr. S.D. Tex. Dec. 29, 2006) ("[T]he broad policy of the Bankruptcy Code . . . favors transparency and disclosure whenever possible."); *In re eToys, Inc.* 331 B.R. 176, 187 (Bankr. D. Del. 2005) ("Disclosure 'goes to the heart of the integrity of the bankruptcy system.'") (citing *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 236 (Bankr. E.D. Cal. 1988)); *In re Century Plaza Assoc.*, 154 B.R. 349, 352 (Bankr. S.D. Fla. 1992) ("Disclosure of fees is a fundamental concept in bankruptcy.").

In the case at bar, Ameriquest Mortgage Company (the Defendant) had a security interest in the homestead owned by Chapter 13 debtors Lino and Mary Sanchez (the Plaintiffs), and charged them thousands of dollars in post-petition attorney's fees, costs, and property inspection fees without disclosing these charges to either the Plaintiffs or the Court. The Plaintiffs contend that such charges must be disclosed to the Court, and that the charges must be reasonable. The Defendant asserts that neither the security instrument signed by the Plaintiffs nor the Bankruptcy Code requires it to disclose these charges to the Plaintiffs or seek this Court's approval.

The chief question presented on the Motions for Summary Judgment filed by both parties, then, is this: may a creditor holding a lien on a debtor's homestead assess post-petition charges, without giving notice to the debtor and without seeking court approval, if those charges are specifically allowed under a pre-petition contract?

On April 3, 2007, this Court held a hearing on the Plaintiffs' Motion for Partial Summary Judgment and the Defendant's Motion for Summary Judgment. Counsel for both parties made oral arguments, and this Court took the matter under advisement. The Court now makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52 as incorporated into Federal Rule of Bankruptcy Procedure 7052. To the extent that any Finding of Fact is construed

to be a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II. Findings of Fact

The principal facts of this case are not in dispute.  The parties disagree on both the applicable law and its application, however.  The facts, as stipulated to or admitted by the parties, or as admitted in the briefs and filings, are as follows:

1.  On May 23, 2001, the Plaintiffs executed a Texas Home Equity Adjustable Rate Note (the Note) payable to the Defendant in the principal amount of $116,000.00.

2.  Concurrently, the Plaintiffs executed a Texas Home Equity Security Instrument (the Security Instrument) (collectively with the Note, the Loan Documents) granting the Defendant a security interest in the Plaintiffs' homestead located at 1745 Wakefield Dr., Houston, TX 77018 (the Sanchez Homestead) to secure the Plaintiffs' obligations pursuant to the Note.

3.  The Plaintiffs' monthly mortgage payment, which did not include any escrow amounts for taxes or insurance, was $1,184.27.[1]

4.  On December 30, 2002, the Plaintiffs filed a voluntary Chapter 13 petition.[2]

5.  The Plaintiffs did not make their January 2003 or February 2003 mortgage payments.

---

[1] Section 4 of the Security Instrument, titled "Charges; Liens," states that "Borrower shall pay all taxes . . . attributable to the Property which can attain priority over this Security Instrument." [Security Instrument § 4.]

[2] As the main case was filed prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the pre-BAPCPA version of the Bankruptcy Code applies.

6.     On February 21, 2003, the Defendant filed its proof of claim in the amount of $117,871.41.[3]

This claim included $2,417.35 in arrearages, calculated as follows:

    a.    $3,552.81 in delinquent pre-petition monthly (principal and interest) payments, reflecting unpaid mortgage payments from October, November, and December 2002;

    b.    $21.00 in property inspection fees;

    c.    $75.00 in insufficient funds (NSF) fees; and

    d.    a credit of $1,231.46 in Suspense Balance (a prepaid amount held by the Defendant).

The Defendant's proof of claim did not include any attorney fees or costs.

7.     On March 11, 2003, the Defendant filed a motion for relief from stay.  This motion alleged that the Plaintiffs owed the Defendant $115,454.06 in unpaid principal, plus $625.00 in attorney's fees and costs.  [Docket No. 10.][4]

8.     On April 2, 2003, U.S. Bankruptcy Judge Karen Brown signed an Agreed Order between the Plaintiffs and the Defendant (the Agreed Order).  [Docket No. 12.][5]  The Agreed Order stated that on March 31, 2003, the Plaintiffs had paid the Defendant $1,200.00, which sum was to be applied to the mortgage payment for March 2003.  Among other things, the Agreed Order required the Plaintiffs to:

    a.    amend their Chapter 13 Plan to include post-petition arrearages of $2,368.54, reflecting the unpaid monthly payments from January and February of 2003;

---

[3] The Defendant set forth in its proof of claim that it is a secured creditor, and the Plaintiffs agree that the Defendant is not only a secured creditor, but an oversecured creditor.

[4] In this Memorandum Opinion, unless otherwise noted, all references to docket numbers relate to the docket sheet in Case No. 02-45416, and all references to adversary docket numbers relate to the docket sheet in Adversary No. 06-3671.

[5] Judge Brown was originally assigned to the Sanchez proceedings.  However, after the undersigned judge took the bench, Judge Brown transferred several cases, including the case at bar, from her docket to this Court.

b.    pay the Defendant $646.00, reflecting $625.00 in post-petition attorney's fees and costs and $21.00 in post-petition property inspection fees;[6] and

c.    remain current in paying post-petition property taxes unless funds for such insurance and taxes were collected by the Defendant through Plaintiffs' escrow account.[7]

9.    On May 5, 2003, the Plaintiffs filed their First Amended Chapter 13 Plan (the Amended Plan). [Docket No. 16.]

10.    Between March 5, 2003 and November 25, 2003—i.e., pre-confirmation—the Defendant charged the Plaintiffs for $1,675.00 in legal fees, $441.25 in legal costs, and $86.00 in property inspection fees. [Adversary Docket Nos. 13, 23.][8] The Defendant did not disclose any of these charges to the Plaintiffs or the Court.

---

[6] The post-petition arrearages of $646.00 were not incorporated into the Plaintiffs' Chapter 13 Plan; rather, under the terms of the Agreed Order, the Plaintiffs were ordered to pay five monthly installments of $129.20 directly to the Defendant, starting in April 2003 and ending in August 2003.

[7] As noted in Finding of Fact No. 3, the Plaintiffs' mortgage payments did not include monies to pay insurance and taxes.

[8] Section 9 of the Security Instrument, titled "Protection of Lender's Interest in the Property and Rights Under this Security Instrument," states:

> If (a) Borrower fails to perform the covenants and agreements contained in this Security Agreement, (b) there is a legal proceeding that might significantly affect Lender's interest in the property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding . . . . Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.

[Security Instrument, § 9.]

The Defendant charged the Plaintiffs $460.00 in attorney's fees and costs and $8.50 in property inspection fees on March 5 and 6, 2003, prior to filing its Motion for Relief of Stay on March 11, 2003. [Adversary Docket Nos. 13, 17.] However, the record is unclear as to whether these charges were included in the $625.00 in attorney's fees and costs and $21.00 in property inspection fees listed in the March 11 Motion.

11.     On November 25, 2003, Judge Brown confirmed the Amended Plan. Section U of the Amended Plan set forth that "All property of Debtor's Estate shall vest in Debtor upon Debtor receiving a discharge under 11 U.S.C. Sec. 1328 or Debtor's Case being dismissed." [Docket No. 41.]

12.     Between November 25, 2003 and December 23, 2004—post-confirmation—the Defendant charged the Plaintiffs $130.00 in property inspection fees. [Adversary Docket Nos. 13, 23.] The Defendant did not disclose any of these fees to the Plaintiffs or the Court.

13.     Between April 2003 and December 2004, the Plaintiffs made a series of payments to the Defendant which, taken as a whole, were more than equal to the amounts of the monthly mortgage payments owed during this time. [Adversary Docket Nos. 13, 23.]

14.     On December 30, 2004, the Defendant filed a Certificate of Default with the Court, alleging that the Plaintiffs had defaulted by not making the monthly payments due pursuant to the terms of the Agreed Order. [Docket No. 46.]

15.     On January 18, 2005, the Defendant returned the Plaintiffs' December 2004 mortgage payment check, along with a letter stating: "We are returning your check No. 1472 in the amount of $1,200.00 as your loan is in default, and this amount will not bring your loan current." The Defendant did not send a copy of this letter to the Plaintiffs' counsel or the Court. [Adversary Docket Nos. 13, 23.]

16.     In a letter dated January 27, 2005, the Defendant returned the Plaintiffs' January 2005 mortgage payment. [Adversary Docket Nos. 13, 23.]

17.     On January 28, 2005, the Defendant mailed the Plaintiffs a letter offering them a
"Forbearance Plan Agreement" (the Forbearance Agreement).  The Defendant did not send
a copy of this letter to the Plaintiffs' counsel or the Court. [Adversary Docket Nos. 13, 23.][9]

18.     On February 3, 2005, without having consulted their counsel, the Plaintiffs signed the
Forbearance Agreement and, pursuant to its terms, sent $4,000.00 to the Defendant.  The
Defendant applied these monies as follows: $1,200.00 to "Additional Bankruptcy Fees,"
$516.25 to "Additional Bankruptcy Costs," $217.00 to "Property Inspections," and $2,270.47
to "Accrued Interest." [Adversary Docket Nos. 13, 23.]

19.     In March 2005, the Defendant paid delinquent property taxes on the Sanchez Property.
[Adversary Docket Nos. 13, 23.]  Specifically, in a letter dated May 9, 2005, the Plaintiffs
were informed that with reference to the Sanchez Property, the Defendant had paid taxes of
$9,540.32 (relating to Harris County) and $10,812.65 (relating to Houston ISD), and that
both tax claims were from tax year 2001.  The Defendant then added the amount of these
taxes to the Plaintiffs' account, thereby increasing the claim held by the Defendant.  The
Defendant did not disclose its actions to the Court nor did the Defendant file a Transfer of
Claim.

20.     In February, March, and April 2005, the Defendant returned the payments it received from
the Chapter 13 Trustee. [Adversary Docket Nos. 13, 23.]

21.     In June 2005, the Defendant sent the Plaintiffs an "Escrow Account Projection for the
Coming Year," reflecting an escrow shortage of $23,230.54 and an increased monthly
payment of $3,479.85. [Adversary Docket Nos. 13, 23.]

---

[9] Unfortunately, neither party submitted a copy of the Forbearance Agreement to the Court, so its exact terms
cannot be described or analyzed.

22. The Defendant did not provide the Plaintiffs with a transaction history except upon request.

23. On March 23, 2006, the Defendant filed a motion in state court to foreclose on the Plaintiffs' homestead. This motion was denied on November 16, 2006. [Adversary Docket Nos. 13, 23.]

24. On November 22, 2006, the Plaintiffs initiated this Adversary Proceeding by filing a Complaint against the Defendant with several causes of action [Adversary Docket No. 1]:[10]

   a. Violation of the automatic stay pursuant to 11 U.S.C. § 362(a);[11]

   b. Failure to seek approval for fees, costs, and charges pursuant to § 506(b) and Bankruptcy Rule 2016(a);

   c. Willful violation of the Court's confirmation order;

   d. Failure to obtain the Court's approval of the Forbearance Agreement;

   e. Invalid purchase and transfer of tax claims pursuant to Rule 3001(e); and

   f. Objection to claim pursuant to § 502(b), or in the alternative, reconsideration for cause pursuant to § 502(j).

25. On December 28, 2006, the Defendant filed its Answer to the Plaintiffs' Complaint. [Adversary Docket No. 5.]

26. On February 23, 2007, the Defendant filed a Motion for Summary Judgment, and the Plaintiffs filed a Motion for Partial Summary Judgment and a Request for Hearing.

---

[10] The complaint lists seven causes of action, but some of them are duplicative or request a different or additional form of relief.

[11] Hereinafter, unless otherwise noted, all section references shall refer to 11 U.S.C., all references to "the Code" shall refer to the United States Bankruptcy Code in effect when the main case was initiated in 2002 (i.e., prior to the BAPCPA amendments), and all references to a "Rule" or "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure from 2004.

[Adversary Docket Nos. 10, 11.]  Responses and Replies from the parties followed in due course.  [Adversary Docket Nos. 14, 15, 18, 19.]

27.     Meanwhile, on March 15, 2007, the Plaintiffs filed an Amended Complaint [Adversary Docket No. 13]; the Defendant filed its Answer to the Amended Complaint on March 26, 2007 [Adversary Docket No. 16] and its Amended Answer to the Amended Complaint on April 9, 2007 [Adversary Docket No. 23].

28.     On April 3, 2007, this Court held a hearing on the respective Motions for Summary Judgment, and after listening to oral arguments, took the matter under advisement.

## III. Conclusions of Law

### A.      Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1).  This dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), (K), and (O).  Venue is proper pursuant to 28 U.S.C. § 1409.

The Fifth Circuit has adopted a "more exacting theory of post-confirmation bankruptcy jurisdiction" which limits the jurisdiction of bankruptcy courts, once a debtor's estate ceases to exist, to those matters pertaining to the implementation or execution of the plan. *Bank of Louisiana v. Craig's Stores of Tex., Inc.* (*In re Craig's Stores of Texas, Inc.*), 266 F.3d 388, 390-91 (5th Cir.2001); *see also In re U.S. Brass*, 301 F.3d 296, 304 (5th Cir. 2002).  Although *Craig's Stores* and *U.S. Brass* were Chapter 11 cases, the Fifth Circuit's language and reasoning is equally applicable to Chapter 13 cases.  Section 1327(b), which solely applies to Chapter 13 cases, states: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."  Accordingly, in the Fifth Circuit, once a plan is

9

confirmed in a Chapter 13 case, there is no longer any estate unless the plan says otherwise and, just like a Chapter 11 case in which a plan has been confirmed, the Court's jurisdiction is limited to matters pertaining to the implementation or execution of the plan.

In the case at bar, the Plaintiffs' Chapter 13 estate has continued to exist after confirmation due to express language in the Amended Plan. The Amended Plan sets forth that "[a]ll property of Debtor's Estate shall vest in Debtor upon Debtor receiving a discharge under 11 U.S.C. Sec. 1328 or Debtor's Case being dismissed." [Finding of Fact No. 11.] The Plaintiffs have not received a discharge under 11 U.S.C. § 1328, nor has the Plaintiffs' case been dismissed; therefore, property of the Plaintiffs' Chapter 13 estate has not yet vested in the Plaintiffs. In other words, the Plaintiffs' estate still exists. Thus, the Court continues to maintain jurisdiction over the Plaintiffs' estate, and over controversies regarding post-confirmation (and, of course, pre-confirmation) charges to the estate.

The Defendant has sought—and obtained—satisfaction of pre-confirmation and post-confirmation charges from property of the Plaintiffs' estate. The Defendant assessed the Plaintiffs pre-confirmation and post-confirmation charges, but did not disclose these charges to the Plaintiffs, the Trustee, or the Court. These charges were then paid from monies delivered by the Trustee—that is, from property of the estate—that were intended to satisfy the mortgage payment. Any amounts charged by the Defendant "correspondingly enlarge the debt of the estate, make reorganization more difficult for the debtor, and adversely impact upon the claims of the remaining creditors." *Jones v. Wells Fargo (In re Jones)*, No. 03-16518, Adv. No. 06-01093, 2007 WL 1112047, at *8 (Bankr. E.D. La. April 13, 2007) (quoting *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1055 (5th Cir.1986)). Thus, because the Defendant satisfied its undisclosed charges from property of the Plaintiffs' estate

and thereby directly affected the Amended Plan, this Court has jurisdiction over the controversy, and may further determine whether the claims are appropriate under applicable law. *Id.* at *9.

In the alternative, even if the Plaintiffs' estate had ceased to exist upon confirmation, the Court would continue to have jurisdiction over this controversy under the Fifth Circuit's "more exacting theory," because the controversy concerns matters pertaining to the implementation or execution of the Amended Plan. The Plaintiffs allege that the Defendant, without notifying or seeking permission from the Court, violated the confirmed Amended Plan and improperly modified the Amended Plan. As noted above, by assessing undisclosed charges, the Defendant has enlarged the debt of the estate, made reorganization more difficult for the Plaintiffs, and negatively affected the claims of the remaining creditors. The Defendant also entered into the Forbearance Agreement with the Plaintiffs, thereby modifying both parties' rights under the Amended Plan. Without deciding, for the moment, whether the Defendant's actions violated or improperly modified the Amended Plan, the Court concludes that the Defendant's actions have affected the implementation and execution of the Amended Plan. Accordingly, this Court holds that it has jurisdiction over this controversy, even under the Fifth Circuit's more exacting theory of post-confirmation jurisdiction.

### B.   Summary Judgment Standard

A court may grant summary judgment only if there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005).

The burden rests initially on the movant to show that there is no genuine issue concerning any material fact and that the non-movant cannot prevail. *Celotex*, 477 U.S. at 325. The non-

moving party must then show that there is evidence from which a finder of fact could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The court must accept all of a non-movant's evidence as true, and will view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *Id.* at 255.

### C.      Post-petition, pre-confirmation charges

#### i. Applicability of § 506(b)

At the outset, it is important to distinguish between the Defendant's post-petition, pre-confirmation charges and its post-confirmation charges. The Defendant's post-petition, pre-confirmation charges are subject to § 506(b), which states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (2004); *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 n.2 (1989).

#### ii. Are Defendant's post-petition, pre-confirmation charges allowable under § 506(b)?

Only oversecured creditors may assess post-petition, pre-confirmation charges pursuant to § 506(b). Moreover, by the plain language of the statute, any charges assessed pursuant to § 506(b) must be reasonable and provided for in the agreement under which the claim arose. 11 U.S.C. § 506(b); *Ron Pair*, 489 U.S. at 241. The standard for determining reasonableness is provided by federal law. *See In re Hudson Shipbuilders*, 794 F.2d at 1056-57; *In re Cummins Utility, L.P.*, 279 B.R. 195, 204 (Bankr. N.D. Tex. 2002) ("[I]n its assessment of what is 'reasonable' under section 506(b) the Court must apply federal law.") The burden to show that the charges are reasonable is on the party seeking to impose charges. *In re 900 Corp.*, 327 B.R. 585, 595 (Bankr. N.D. Tex. 2005) ("However, the burden is on the oversecured creditor seeking fees under section 506(b) to show that

its fees are reasonable.") (citing *In re Atwood*, 293 B.R. 227 (9th Cir. BAP 2003); *In re White*, 260 B.R. 870 (8th Cir. BAP 2001)).

Section 506(b) works in tandem with Rule 2016, which lays out the process for requesting payment of attorney's fees, costs, and other charges.  This rule applies to any person or entity seeking compensation for services rendered or reimbursement of expenses from the estate.  *Tate v. NationsBanc Mortgage* Corp. (*In re Tate*), 253 B.R. 653, 665 (Bankr. W.D.N.C. 2000).  In relevant part, Rule 2016 states:

> An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared . . . . The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is filed by a creditor or other entity. . . .

FED R. BANKR. P. 2016(a).

In short, any entity seeking to charge a Chapter 13 debtor's estate must provide documentation of these charges, so that the court, the debtor, and other parties-in-interest can review and analyze each application for compensation.  Courts rely on such applications to gauge the reasonableness of requests under § 506(b).  *In re Jones*, 2007 WL 1112047, at *8 ("Postpetition charges incurred prior to confirmation . . . must be disclosed and are subject to review by the bankruptcy court for reasonableness.") (footnotes omitted); *In re Tate*, 253 B.R. at 665.  Indeed, the "primary objective of any fee application is 'to provide sufficient data to enable the court to determine whether the services rendered were reasonable, actual, and necessary.'" *In re Gillett Holdings, Inc.*, 137 B.R. 475, 480 (Bankr. D. Colo. 1992) (quoting *In re Wire Cloth Products, Inc.*, 130 B.R. 798, 806 (Bankr. N.D. Ill. 1991)).  As many courts have noted, a creditor's burden of

submitting 2016 fee applications is "not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate." *In re Universal Factoring Co., Inc.*, 329 B.R. 62, 65 (Bankr. N.D. Okla. 2005); *In re Mahaffey*, 247 B.R. 823, 825 (Bankr. D. Mont. 2000); *In re Yankton College*, 101 B.R. 151, 158 (Bankr. D.S.D. 1989); *In re Hotel Associates, Inc.* 15 B.R. 487, 488 (Bankr. E.D. Pa. 1981).

Section 506(b) and Rule 2016 are in place to protect both creditors and debtors: they allow creditors to charge professional fees pursuant to a contract, while assuring the debtor—and other creditors—that such fees will be reasonable. The purpose of the reasonableness requirement is to ensure that creditors are not given a "blank check" to incur fees that will be charged against the estate. *In re 900 Corp.*, 327 B.R. at 593-94 (quoting *In re Center*, 282 B.R. 561, 567 (Bankr. D.N.H. 2002)). Such assurance goes hand in glove with the overall purpose of § 506(b)—to protect estate assets from excessive fees charged by oversecured creditors and their overzealous attorneys. *Id.* at 599 (citing *In re Crowley*, 293 B.R. 628, 633 (Bankr. D. Vt. 2003)).

The Plaintiffs concede that the Defendant is an oversecured creditor and, as such, is entitled to charge "reasonable fees, costs, or charges" under the terms of § 506(b). But, the Plaintiffs contend, because the Defendant failed to disclose the charges as required by Rule 2016, no basis exists for determining whether such charges were reasonable. The Defendant responds that disclosure is irrelevant because neither § 506(b) nor Rule 2016 applies—the fees are specifically allowed under the signed contract between the Plaintiffs and the Defendant, and § 1322(b)(2) is the controlling statute.

The Court agrees with the Plaintiffs. The Defendant, as the entity seeking reimbursement for expenses from the estate, has the burden to file Rule 2016 disclosures and show that its charges are reasonable as required by § 506(b). By failing to disclose those charges to the Court, the

Defendant has not met its burden.  The Court finds that the Defendant's failure to disclose charges to the Plaintiffs, and its concomitant failure to file Rule 2016 applications with the Court, render those charges per se unreasonable.

In failing to make the proper disclosures, the Defendant has acted in a manner antithetical to the spirit of the Bankruptcy Code.  The three most important words in the bankruptcy system are: disclose, disclose, disclose.  No one involved in this case disputes the Defendant's right to charge reasonable attorney's fees, costs, and property inspection fees as allowed under the Loan Documents and § 506(b).  But by failing to disclose these charges to either the Plaintiffs or the Court, the Defendant made it impossible to determine the charges' reasonableness.  Not only did the Defendant deny the Plaintiffs and this Court the opportunity to review the charges, it also collected these charges at the expense of the estate's other creditors.  Every dollar that the Defendant charges translates into one less dollar for the estate.  This, the Court will not allow.  Accordingly, the Court concludes that the pre-confirmation attorney's fees, costs, and property inspection fees charged by the Defendant are unreasonable.

### iii. Applicability of § 1322(b)(2)

Section 1322(b)(2) protects creditors with claims secured only by a lien on the debtor's home, providing that a debtor's plan may "modify the rights of holders of secured claims, <u>other than a claim secured only by a security interest in real property that is the debtor's principal residence</u>, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims" 11 U.S.C. § 1322(b)(2) (emphasis added); *Nobleman v. American Savings Bank*, 508 U.S. 324, 327 (1993).

The Defendant argues, correctly, that because its claim is secured only by the Plaintiffs' principal residence, § 1322(b)(2) applies.  This point is uncontroversial and uncontroverted.  The

Defendant further contends, however, that because the Loan Documents give it the contractual right to assess attorney's fees, charges, and property inspection fees, § 1322(b)(2) renders the contractual language sacrosanct, and neither § 506(b) nor Rule 2016 may be given effect. To support its contention, the Defendant cites to *Nobleman* and *Campbell v. Countrywide Home Loans, Inc.* (*In re Campbell*), 361 B.R. 831 (Bankr. S.D. Tex. 2007).

The Court is unswayed by the Defendant's argument. Section 1322(b)(2) gives the holders of secured homestead interests considerable protection, but it does not give them carte blanche to charge any fees that follow the letter of the contract.

A longstanding canon of construction holds that if two statutes conflict, a more specific statute will take precedence over a more general statute. *See Bulova Watch Co. v. U.S.*, 365 U.S. 753, 758 (1961); *Campbell*, 361 B.R. at 850 (citing *In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 548 (5th Cir. 2002)). To the extent they conflict, the more specific provisions of § 1322(b)(2) will prevail over the more general provisions of § 506. *Nobleman*, 508 U.S. at 332; *Campbell*, 361 B.R. at 850. This explains why the Defendant is entitled to charge reasonable attorney's fees and costs and property inspection fees pursuant to § 1322(b)(2).

However, as the Supreme Court has noted, "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). It is not difficult to harmonize § 506(b) and Rule 2016 with § 1322(b)(2), and the Defendant has not provided any case law to the contrary. Requiring a creditor to file a Rule 2016 application with the bankruptcy court in order to collect fees from the estate does not modify that creditor's right to collect those fees. Similarly, requiring a creditor to affirmatively demonstrate that its fees are reasonable does not modify that creditor's right

to collect such fees. Creditors have a panoply of contractual rights under § 1322(b)(2), but the right to charge <u>unreasonable</u> fees has never been among them. Thus, the Defendant's rights to collect fees pursuant to § 1322(b)(2) are not modified by having to file a Rule 2016 application with the Court, nor by having to make an affirmative showing that its fees are reasonable under § 506(b).

### D.    Post-confirmation charges

The Defendant's post-confirmation charges are not subject to § 506(b). *Rake v. Wade*, 508 U.S. 464, 468 (1993); *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 797 (5th Cir. 1997) ("§ 506(b) applies only from the date of filing through the confirmation date.") (citing *Rake*, 508 U.S. at 468). In their Motion for Partial Summary Judgment, the Plaintiffs argue that § 506(b) should apply to post-confirmation charges, but fail to cite any case law in support of this proposition; nor do they distinguish the facts in the instant suit from those in *Rake* and *T-H New Orleans Ltd. Partnership*. [Adversary Docket No. 11.] Accordingly, this Court, pursuant to the decisions from the Supreme Court and the Fifth Circuit, concludes that the post-confirmation charges are not subject to § 506(b).

That being said, the Court still has jurisdiction over a Chapter 13 case after confirmation, *Jones*, 2007 WL 1112047, at *8-9, and the authority to determine whether post-confirmation fees and charges are reasonable. For post-confirmation charges, state law governs whether the fees charged pursuant to the Loan Agreement are reasonable. *Campbell*, 361 B.R. at 850. Therefore, this Court must look to Texas law to determine whether the fees charged pursuant to the Loan Documents are reasonable.

The reasonableness of attorney's fees is a question of fact and must be supported by competent evidence. *Id.* (citing *Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2005, no pet.)) In considering the reasonableness of these charges, this

Court may consider several factors, including: (1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex. 1997); *Padilla v. NCJ Development, Inc.*, 218 S.W.3d 811, 816 (Tex. App.—El Paso 2007, pet. struck)

If the Defendant had disclosed its attorney's fees, costs, and property inspection fees to the Plaintiffs and the Court, this Court would have been able to apply the above factors to determine whether these charges are allowable under Texas law. As discussed above, the Defendant has the right to charge the Plaintiffs reasonable attorney's fees and costs and property inspection fees as allowed pursuant to the Loan Documents. But, by failing to disclose these charges to either the Plaintiffs or the Court, the Defendant made it impossible to determine the charges' reasonableness. Not only did the Defendant deny the Plaintiffs and this Court the opportunity to review the charges, it also attempted to collect these charges at the expense of all the estate's other creditors. Just as with the pre-confirmation charges, every dollar that the Defendant charges post-confirmation translates into one less dollar for the estate. Accordingly, just as with the pre-confirmation charges, the Court concludes that the post-confirmation attorney's fees, costs, and property inspection fees charged by the Defendant are per se unreasonable.

### E. Effect and Applicability of Res Judicata

The Defendant argues, in the alternative, that to the extent the Plaintiffs' complaint is based on pre-confirmation charges, it should be barred by res judicata. Preclusion of a claim under the res judicata doctrine requires four elements: (1) the parties must be identical in the two actions; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same claim or cause of action must be involved in both cases. *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319 (5th Cir. 2007) (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir.2004)).

The confirmation of a plan is treated as res judicata as to all justiciable issues which were or could have been decided at the confirmation hearing. *Sanders v. City of Brady (In re Brady)*, 936 F.2d 212, 215 (5th Cir.1991); *see also* 11 U.S.C. § 1327(a); *Sun Finance Co. v. Howard (In re Howard)*, 972 F.2d 639, 641 (5th Cir. 1992) (noting the general rule that "a confirmed Chapter 13 plan is res judicata as to all parties who participate in the confirmation process."). After confirmation of a plan, any objections to claims that could have been made prior to confirmation are barred. 11 U.S.C. § 502(a). However, courts will not defer to a confirmed plan if predicate steps required by the Code or Bankruptcy Rules were not followed, *see In re National Gypsum Co.*, 208 F.3d 498, 514 (5th Cir. 2000), or if doing so would result in a denial of due process. *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993). As the Supreme Court has noted, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314 (1950) (citations omitted).

Moreover, while the confirmation of a Chapter 13 plan is indeed final in many respects, it by no means disposes of a Chapter 13 case. Even after confirmation, a Chapter 13 debtor may convert or dismiss the Chapter 13 case (if it has not been previously converted), pursuant to §§ 1307(a) and (b), or modify the plan pursuant to § 1329. Put another way, "if a confirmation order is not res judicata as to all possible issues for debtors, it cannot be res judicata as to all issues for creditors." *In re Eden*, 141 B.R. 121, 125-26 (Bankr. W.D. Tex. 1992) (citing *In re Shaffer*, 48 B.R. 952, 957 (Bankr. N.D. Ohio 1985)).

The Defendant observes, correctly, that its claim was confirmed as part of the Amended Plan and that prior to confirmation, the Plaintiffs did not object to this claim or raise any issues related to the fees charged by the Defendant. The Defendant further notes that the Loan Documents authorize it to charge fees, and that it assessed most of the complained-of fees prior to the confirmation of the Amended Plan. Therefore, the Defendant argues, the Plaintiffs had "sufficient opportunity to raise any issues related to the fees assessed post-petition prior to their plan confirmation" [Adversary Docket No. 10], and because the Plaintiffs did not object, res judicata bars them from now objecting to the pre-confirmation charges.

The Defendant's argument leaves out a key piece of information: the Defendant never informed the Plaintiffs that it was assessing the complained-of charges, nor did it include these charges in its proof of claim. [Finding of Fact Nos. 10, 12.] The Defendant contends that it had no duty to inform the Plaintiffs that it was assessing attorney's fees, costs, and property inspection fees, and that if the Plaintiffs wanted to know what they were being charged, all they had to do was ask.

The Defendant's reliance on res judicata is misplaced. Res judicata cannot bar objections to charges that debtors did not know existed. Just as debtors cannot be expected to make pre-confirmation objections to claims that have yet to be filed, *In re 50-Off Stores, Inc.*, 220 B.R. 897,

907 (Bankr. W.D. Tex. 1998), they cannot be expected to object to the reasonableness of fees and costs pursuant to § 506(b) when they have no notice of the amount of such fees or costs. While the Plaintiffs had notice that the Defendant <u>could charge</u> them attorney's fees, costs, and property inspection fees, the Plaintiffs did not have notice that the Defendant <u>did charge</u> them these fees. In alleging that the complained-of fees "arise out of" the Loan Documents and the Plaintiffs therefore had sufficient opportunity to raise objections, the Defendant improperly conflates the two types of notice.

The Plaintiffs' knowledge that the Loan Documents allowed the Defendant to charge attorney's fees, costs, and property inspection fees does not constitute notice that the Defendant was <u>in fact</u> charging these fees. In failing to disclose the attorney's fees, costs, and property inspection fees to the Plaintiffs, the Defendant did not afford the Plaintiffs an opportunity to object to these charges, and thereby failed to give the Plaintiffs due process. In failing to disclose the attorney's fees, costs, and property inspection fees to the Court, as required by Rule 2016, the Defendant failed to give the Court the opportunity to determine the reasonableness of these charges as required by § 506(b), and therefore, the Court did not adjudicate the allowance of the Defendant's charges on the merits. Therefore, the Defendant's claim is not a final judgment.

This Court will not ratify the Defendant's failure to disclose. Res judicata does not bar the Plaintiffs' objections to pre-confirmation attorney's fees, costs, and property inspection fees.

This Court has already held that the Defendant failed to meet its obligations of disclosure pursuant to § 506(b) and Rule 2016. It is worth noting that the Defendant kept an ongoing, detailed record of the Plaintiffs' payment and fee history, and could easily have disclosed to the Plaintiffs that it was assessing them attorney's fees, costs, and property inspection fees.

21

**F.      The Plaintiffs' Private Right of Action and the Court's Authority to Act**

The Defendant argues that neither § 506(b), Rule 2016 nor § 105(a) can give rise to an

independent cause of action.  The Plaintiffs, by contrast, contend that a private right of action exists

under all three.

The Court does not need to address whether the Plaintiffs have a private right of action under

§ 506 or Rule 2016.  Instead, the Court may use its equitable powers under § 105(a) to enforce the

provisions of § 506 and Rule 2016.   The Court may also enforce the provisions of § 362 on three

separate bases: (1) the Plaintiffs have a private right of action under § 362(h) for the Defendant's

violation of the automatic stay; (2) the Court may use its powers under § 105(a) to enforce a specific

provision of the Code, namely § 362; and (3) the Court may invoke its civil contempt powers

pursuant to § 105(a) because the automatic stay was imposed pursuant to a court order.  Finally, the

Court may also invoke its civil contempt powers pursuant to § 105(a) with regard to the Defendant's

alleged violation and improper modification of the Amended Plan, because the Amended Plan was

imposed through a court order.

**1. The Court's Authority Under § 105(a)**

Section 105(a) provides, in relevant part:

> The court may issue any order, process, or judgment that is necessary or appropriate
> to carry out the provisions of this title. No provision of this title providing for the
> raising of an issue by a party in interest shall be construed to preclude the court from,
> *sua sponte*, taking any action or making any determination necessary or appropriate
> to enforce or implement court orders or rules, or to prevent an abuse of process.

As the Supreme Court recently held, § 105(a) grants bankruptcy judges "broad authority ...

to take any action that is necessary or appropriate 'to prevent an abuse of process.'"  *Marrama v.*

*Citizens Bank of Mass.*, 127 S.Ct. 1105, 1111-12 (2007) (quoting § 105(a)).  The Fifth Circuit has

held that § 105(a) is to be "interpret[ed] liberally," so long as any action taken pursuant to § 105(a)

is "consistent with the rest of the Bankruptcy Code." *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 760 (5th Cir. 1995). Section 105(a) thus permits bankruptcy courts to "fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code." *Perkins Coie v. Sadkin* (*In re Sadkin*), 36 F.3d 473, 478 (5th Cir. 1994) (quoting *Chiasson v. Bingler* (*In re Oxford Management Inc.*), 4 F.3d 1329, 1333 (5th Cir.1993)). To be sure, the Court's authority is also circumscribed by the plain language of 105(a), which requires a link between its exercise of power and one or more provisions of the Code. Section 105(a) does not "authorize the bankruptcy courts to create substantive rights otherwise unavailable under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986)). The Supreme Court, amplifying this point, has held that "[u]nder this section, a court may exercise its equitable power only as a means to fulfill some specific Code provision." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

District Judge Lee Rosenthal, in a recent opinion, further distinguished between the Supreme Court's *Ahlers* and *Marrama* decisions. *Perez v. Peake* (*In re Perez*), No. H-06-1140 (S.D. Tex. Jul. 19, 2007). "In *Marrama*, the Court did not overrule *Ahlers*. In *Marrama*, the Supreme Court recognized that Congress can restrict equitable powers by clear and unambiguous drafting of Code provisions. . . . *Marrama* upheld a pragmatic remedy fashioned by a bankruptcy judge under section 105(a) to achieve a result that the Code clearly required, despite the apparently inconsistent approach of another Code section that was unclear or ambiguous."

Accordingly, a bankruptcy court is well within its authority if it exercises its equitable powers under § 105(a) to achieve a result the Code clearly requires. *In re Sadkin*, 36 F.3d at 478-79 (5th Cir. 1994) ("Section 105(a) provides equitable powers for the bankruptcy court to use at its discretion");

*In re Stern*, 204 F.3d 1117, at *2 (5th Cir. 1999) (unpublished table decision) ("Whether a court should invoke its equitable powers under § 105(a) is a matter of discretion.").

### a. The Court's powers under § 105(a) to enforce a specific provision of the Code, namely § 362

A bankruptcy court has the authority under § 105(a) to enter orders and judgments for violations of the automatic stay pursuant to § 362(h).[12] *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003). The Defendant assessed the Plaintiffs post-petition charges, failed to notify the Plaintiffs, the Trustee, or the Court, and paid itself out of estate funds delivered to it for the payment of other debts. The Plaintiffs allege that the Defendant's failure to disclose these charges render them an illegal collection from estate property, which violates the automatic stay pursuant to § 362. The Court is well within its authority to determine whether the Defendant's actions have violated the automatic stay, and if so, the Court may exercise its equitable powers under § 105(a) to enforce § 362(h).

### b. The Court's civil contempt powers under § 105(a)

The Court also has the power, under § 105(a), to issue sanctions under its civil contempt power or pursuant to its equitable powers. *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc.* (*In re Terrebonne Fuel & Lube, Inc.*), 108 F.3d 609, 613 (5th Cir.1997) ("The language of [§ 105] is unambiguous. Reading it under its plain meaning, we conclude that a bankruptcy court can issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions of the bankruptcy code."); *In re Harris*, 297 B.R. 61, 70 (Bankr. N.D. Miss. 2003) ("[Section] 105 provides a bankrupcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have.").

---

[12] Section 362(h) provides: "An individual injured by an willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h) (2004)

As the Fifth Circuit has observed, "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *American Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (emphasis added) (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). An automatic stay is a self-executing injunction, and therefore for contempt purposes it constitutes an order of the bankruptcy court. *San Angelo*, 292 B.R. at 124. Similarly, a debtor's plan is confirmed pursuant to an order of the bankruptcy court. *See Eubanks v. F.D.I.C.*, 977 F.2d 166, 170 (5th Cir. 1992). Thus, the Court may issue sanctions under § 105(a) for contempt of an order imposing an automatic stay, *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 269 (Bankr. N.D. Tex. 2002),[13] or for contempt of an order confirming a debtor's plan. *Terrebonne*, 108 F.3d at 613.

In addition to charging the Plaintiffs post-petition fees without notification and paying itself out of estate funds, the Defendant also modified its rights under the Amended Plan by entering into the Forbearance Agreement with the Plaintiffs—also without notice to the Court, the Trustee, or the Plaintiffs' counsel. The Plaintiffs have alleged that the Defendant's actions render it liable for civil contempt. In that the Court issued orders imposing the automatic stay and confirming the Amended Plan, the Court holds that it has the authority to determine if these orders have been violated, and if so, to impose sanctions for civil contempt pursuant to its authority under § 105(a).

### c. The Court's equitable powers under § 105(a) to enforce the provisions of § 506 and Rule 2016

---

[13] For the sake of clarity, the Court wishes to distinguish its two bases for issuing sanctions under § 105(a) for violations of the automatic stay. First, the Court may use § 105(a) to enforce the provisions of § 362(h), i.e., for a party's violation of the automatic stay. Second, the Court may use § 105(a) as part of its contempt powers, i.e., for a party's violation of the Court's order imposing the automatic stay.

The Defendant insists that the provisions of the Code do not expressly create a legal remedy for the Plaintiffs either under § 506(b) or pursuant to Rule 2016, and, under the four-factor analysis for implying private causes of action laid out in *Cort v. Ash*, 422 U.S. 66 (1975),[14] this Court cannot imply a cause of action under § 105(a).  If the Plaintiffs' Complaint is allowed to stand, the Defendant argues, this Court would be affording the Plaintiff newly created substantive rights with no basis in the Code, thereby acting in excess of the Court's authority under § 105(a).

The Defendant's argument is unpersuasive.  The Court does not need to find a private right of action under § 506(b) or Rule 2016 to conclude that "§ 506(b) and Rule 2016 create rights *and* duties for creditors in bankruptcy cases.  A creditor may be entitled to payment of professional fees under its contract with a debtor, but before those funds will be paid from the bankruptcy estate, the creditor must affirmatively demonstrate the reasonableness of the fees to the court after notice.  If a creditor elects to ignore the law to obtain such fees, it is well within the Court's authority under § 105 to rectify that error." *In re Tate*, 253 B.R. at 668.

In filing its initial claim and obtaining payments under the Amended Plan, the Defendant has already reaped the benefits of § 506(b).  Now, in contending that the Court does not have the authority to order the disgorgement of monies improperly collected from the Plaintiffs' estate, the Defendant suggests that the same statutory scheme which previously protected its interest no longer applies.  The Bankruptcy Code is not so fickle.  Just as this Court had the authority to order the Defendant to be paid its reasonable fees pursuant to § 506(b), this Court also has the authority to sanction the Defendant for its failure to comply with § 506(b) and Rule 2016.

---

[14] The *Cort* factors for determining whether a court can imply a private cause of action from a federal statute are whether: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) there is any explicit or implicit indication of congressional intent to provide a private remedy; (3) whether a private remedy would be consistent with the underlying purpose of the statutory scheme; and (4) whether the cause of action is typically left to state law.  422 U.S. at 78.

### 2. The Plaintiffs' Private Right of Action Under § 362(h)

Section 362(h) provides: "An individual injured by an willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

The Fifth Circuit has held that § 362(h) "creates a private remedy for one injured by a willful violation of an automatic stay . . . . To hold that 11 U.S.C. § 362(h) does not create a private right of action would require us to ignore its plain and express language." *Pettit v. Baker*, 876 F.2d 456, 457 (5th Cir. 1989) (citations omitted). *See also In re O'Connor*, No. 01-2135, 2001 WL 1335883, at *1 n.* (N.D. Tex. Oct. 25, 2001) (noting that the private right of action for a party injured by a willful violation of an automatic stay is distinct from a court's power to conduct civil contempt proceedings for violation of a court order).

The Defendant charged the Plaintiffs post-petition fees, failed to notify the Plaintiffs, the Trustee, or the Court, and paid itself out of estate funds delivered to it for the payment of other debt. The Plaintiffs allege that the Defendant's willful failure to disclose these fees render them an illegal collection of fees from estate property, which violates the automatic stay pursuant to § 362(h). The Plaintiffs also allege that the Defendant's actions have caused them actual damages. Hence, the Plaintiffs have a private right of action for the Defendant's allegedly willful violation of the stay pursuant to § 362(h).

### G. The Defendant's violation of the automatic stay

#### 1. Did the Defendant Violate the Automatic Stay?

Section 1306 defines property of the Chapter 13 debtor's estate as follows:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title--
    (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed,

or converted to a case under chapter 7, 11, or 12 of this title, whichever
occurs first; and
(2) earnings from services performed by the debtor after the commencement
of the case but before the case is closed, dismissed, or converted to a case
under chapter 7, 11, or 12 of this title, whichever occurs first.
(b) Except as provided in a confirmed plan or order confirming a plan, the debtor
shall remain in possession of all property of the estate.

Section 362(a) of the Bankruptcy Code provides that, with certain exceptions, the filing of

a bankruptcy petition operates as a stay, applicable to all entities, of:

(3) any act to obtain possession of property of the estate or of property from the estate
or to exercise control over property of the estate;
. . .
(5) any act to create, perfect, or enforce against property of the debtor any lien to the
extent that such lien secures a claim that arose before the commencement of the case
under this title;
(6) any act to collect, assess, or recover a claim against the debtor that arose before
the commencement of the case under this title . . .[15]

In deciding a recent case with strikingly similar facts to the case at bar, Bankruptcy Judge

Elizabeth W. Magner noted that when a bank "applies any portion of Debtor's earnings to

undisclosed fees and charges, rather than the installments owed under the note and payable under

the plan, it reduces Debtor's ability to pay either the reasonable and necessary costs of his support

or the amounts due under his plan." *In re Jones*, 2007 WL 1112047, at *12. Therefore, Judge

Magner concluded, the bank's "satisfaction of postpetition charges constitutes a taking of property

of the estate and impacts the Debtor's ability to comply with the terms of the plan." *Id.*

In the instant case, the Defendant has violated § 362(a)(3) by taking property of the estate

without this Court's approval. The Defendant assessed the Plaintiffs post-petition charges

comprising attorney's fees, costs, and property inspection fees. The Defendant then satisfied these

---

[15] The Plaintiffs, in their Amended Complaint, cite §§ 362(a)(5) and (6) as supporting their allegation that the
Defendant violated the automatic stay. The Court believes subsections (5) and (6) do apply, in that the Defendant's
claim–its secured interest in the Sanchez Homestead, as evidenced by the Loan Documents—arose prior to the
commencement of the Plaintiffs' bankruptcy case. That being said, the Court believes a more compelling argument for
the Defendant violating the automatic stay can be made under § 362(a)(3).

charges with the mortgage payment it received from the Chapter 13 Trustee—monies which came from the Plaintiffs' post-petition earnings. Thus, the Defendant satisfied post-petition charges with the Plaintiffs' post-petition earnings, which constituted a taking of property of the estate and severely impaired the Plaintiffs' ability to comply with the terms of the Amended Plan.

### 2. If the Defendant has violated the automatic stay, may the Plaintiffs recover damages?

Section 362(h) provides: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Fifth Circuit has identified three elements that must be present for an individual to recover for a willful violation of an automatic stay: "(1) the defendant must have known of the existence of the stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay." *In re Chestnut*, 422 F.3d 298, 302 (5th Cir. 2005).

### a. The Defendant must have known of the existence of the stay.

The Defendant is a large and sophisticated mortgage company, with years of experience dealing with loans in default, customers who file for bankruptcy, and attendant automatic stays. In the instant case, the Defendant filed a motion for relief from stay on March 11, 2003, which necessarily required that the Defendant knew of the existence of the automatic stay. Further, the Defendant was a party to the Agreed Order of April 2, 2003, which was titled "Agreed Order Conditionally Modifying Automatic Stay." This Court finds that the Defendant knew of the existence of the automatic stay, and therefore the first element is satisfied.

### b. The Defendant's acts must have been intentional.

To satisfy the second element, the Court does not need to find that the Defendant had a specific intent to violate the automatic stay, but only that the Defendant's actions violating the

automatic stay were intentional. *In re Chestnut*, 422 F.3d at 302.  Even if the Defendant had a good

faith belief in its right to the property, such belief is irrelevant.  *Id.*  The Defendant freely admitted

that it intentionally charged the Plaintiffs post-petition attorney's fees, costs, and property inspection

fees without disclosing these charges.  Therefore, the Court finds that the Defendant's actions were

intentional and that the second element is satisfied.

### c. These acts must have violated the stay.

The Defendant assessed the Plaintiffs' account with post-petition charges, failed to notify the

Plaintiffs, the Trustee, or the Court of these charges, failed to seek the Court's approval for these

charges, and then paid itself for these charges out of estate funds.

The Defendant argues that because its charges are allowed under the Loan Documents and

protected by § 1322(b)(2), collecting them cannot constitute a violation of the automatic stay.  This

Court agrees that, under the terms of the Loan Documents and § 1322(b)(2), the Defendant is entitled

to charge the Plaintiffs reasonable attorney's fees, costs, and property inspection fees.  If the

Defendant had disclosed these charges to the Plaintiffs, filed a Rule 2016 fee application with the

Court, and obtained this Court's approval for these charges, then its actions would not have violated

the automatic stay.  But the Defendant did none of these things.  Instead, it unilaterally assessed

additional charges and then paid itself from payments specifically earmarked, under the terms of the

Amended Plan, for the pre-petition arrearage contained in the Defendant's proof of claim (and

subsequently modified by the Agreed Order).  The Defendant had no right to violate the terms of the

Amended Plan and divert these payments for its own purposes without the Court's approval.

As Judge Magner aptly stated in *In re Jones*:

> The filing of a bankruptcy is supposed to be a respite for a debtor, allowing time for
> reorganization. It stops the accrual of unnecessary fees and costs as well as additional
> interest and charges on past due amounts in an effort to allow debtors a fresh start.

The automatic stay prohibits the collection of any amounts owed by a debtor during the administration of the case in order to effect these goals.

*In re Jones*, 2007 WL 1112047, at *13 (citing *In re S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir. 1987).

The Defendant's failure to disclose its additional charges and request permission of the Court to obtain payment from estate property resulted in an illegal collection of charges from estate property. *Id.* (creditor violated automatic stay by charging debtor fees without notice, and paying itself those fees from the estate); *see also In re Chesnut*, 422 F.3d 298 (5th Cir. 2005) (finding that a creditor should seek court permission before taking property that might be property of debtor's estate); *In re Levenstein*, No. 07-22138, 2007 WL 1597852 (Bankr. S.D.N.Y. Jun. 4, 2007) (creditor violated the automatic stay by foreclosing on a house titled in the debtor's spouse's name without seeking court permission); *In re Campbell*, 361 B.R. 831 (Bankr. S.D. Tex. 2007) (creditor violated the automatic stay by collecting pre-petition property taxes from post-petition payments); *In re Han*, 333 B.R. 881 (Bankr. N.D. Fla. 2005) (creditor violated the automatic stay by charging debtor a higher interest rate than allowed by the note). Thus, because the Defendant improperly took property of the estate while the automatic stay was in place, the Defendant violated the automatic stay and the third element is satisfied.

Having shown that all three elements are satisfied, the Plaintiffs may recover damages under § 362(h).

### 3. Calculation of damages for the Defendant's violation of the automatic stay

#### a. Actual damages

Under the plain language of § 362(h), the Plaintiffs "shall recover actual damages, including costs and attorneys' fees," for the Defendant's violation of the automatic stay. The amounts of these damages will need to be determined at trial. Specifically, the Plaintiffs shall recover all of the

attorney's fees, costs, and property inspection fees that the Defendant charged them but did not disclose, as well as all of the reasonable attorney's fees and costs that the Plaintiffs have incurred contesting these charges, including but not limited to all such fees related to the prosecution of this adversary proceeding.

### b. Punitive damages

Section 362(h) also provides for the recovery of punitive damages "in appropriate circumstances," for a violation of the automatic stay. Courts have interpreted "appropriate circumstances" as meaning that the defendant acted in "bad faith," *Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 490 (N.D. Tex. 1999); *Gullett v. Continental Cas. Co.*, 230 B.R. 321, 331 (Bankr. S.D. Tex. 1999), *rev'd on other grounds*, 253 B.R. 796 (S.D. Tex. 1999), or "with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so." *In re Lile*, 103 B.R. 830, 841 (quoting *In re Wagner*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987)).

The Supreme Court has ruled that for punitive awards to satisfy the Fourteenth Amendment's due process clause, a court's constitutional analysis must address reasonableness and adequate guidance concerns. *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 17 (1991). The Fifth Circuit has interpreted *Haslip* to require a two-step test: "(1) whether the circumstances of the case indicate that the award is reasonable; and (2) whether the procedure used in assessing and reviewing the award imposes a sufficiently definite and meaningful constraint on the discretion of the factfinder." *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1381 (5th Cir. 1991). Although the court may consider the size of the punitive damages award and its relationship to the compensatory damages award, neither factor is dispositive. *Id.* at 1382.

The Supreme Court characterized the first *Haslip* prong, reasonableness of the amount of the award, as being supported by two factors: (1) the reprehensible nature of the conduct, and (2) a significant societal interest in preventing similar conduct. 499 U.S. at 17. The second *Haslip* prong, an assessment of the procedural safeguards, does not have to be an exhaustive list of the safeguards, *In re Lile*, 161 B.R. 788 (S.D. Tex. 1993), so long as "there is some meaningful procedural assurance that the amount of the award is not an impulsive reaction to the wrongful conduct of the defendant." *Eichenseer*, 934 F.2d at 1385.

The Court does not have sufficient information at present to render judgment on punitive damages. In particular, the Court does not know enough about the Defendant's motive in violating the automatic stay. Did the Defendant willfully violate the automatic stay? Did it act with reckless disregard of whether it was willfully violating the automatic stay? Were its actions taken in bad faith? The Court needs to hear more evidence before deciding this issue.

In sum, before ruling on the nature and amount of damages, the Court will need to hear evidence on (1) the full extent of attorney's fees, costs, and property inspection fees the Defendant charged the Plaintiffs during their bankruptcy but did not disclose; (2) the amount of attorney's fees and costs that the Plaintiffs have incurred in contesting these charges, including but not limited to the prosecution of this adversary proceeding; and (3) the Defendant's motive in violating the automatic stay.

### H. Contempt for violation of court orders

This Court has the power, under § 105(a), to issue sanctions in enforcement of its civil contempt power. *Terrebonne*, 108 F.3d at 613. And, as the Fifth Circuit has observed, "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the

complainant for losses sustained." *American Airlines,* 228 F.3d at 585.  In the case at bar, the

Defendant has violated two of the Court's orders: (1) the order imposing the automatic stay, and (2)

the order confirming the Amended Plan.

### 1. Violation of the order imposing the automatic stay

As discussed at length above, the Defendant has violated the automatic stay.  For the reasons

stated therein, the Defendant has also violated the Court's order imposing the automatic stay.  For

the sake of brevity, the Court will not reiterate its analysis.

### 2. Violation of the order confirming the Amended Plan

Section 1329 of the Bankruptcy Code provides, in relevant part:

> (a) At any time after confirmation of the plan but before the completion of payments
> under such plan, the plan may be modified, upon request of the debtor, the trustee,
> or the holder of an allowed unsecured claim, to--
>> (1) increase or reduce the amount of payments on claims of a particular class
>> provided for by the plan;
>> (2) extend or reduce the time for such payments; or
>> (3) alter the amount of the distribution to a creditor whose claim is provided
>> for by the plan to the extent necessary to take account of any payment of such
>> claim other than under the plan ...
> (b)
>> (1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements
>> of section 1325(a) of this title apply to any modification under subsection (a)
>> of this section.
>> (2) The plan as modified becomes the plan unless, after notice and a hearing,
>> such modification is disapproved.

11 U.S.C. § 1329 (2004).

Any modified chapter 13 plan must meet all the requirements for confirmation.  11 U.S.C.

§ 1329(b)(1); *In re Rodriguez*, No. 06-50132, 2007 WL 1531609, *3 (Bankr. S.D. Tex., May 24,

2007).  Neither a debtor, trustee, nor unsecured creditor may modify a plan unilaterally; any

modification must be approved by the bankruptcy court after hearing and notice.[16]   11 U.S.C. §

1329(b)(1). A debtor wishing to modify his plan "must comply with 11 U.S.C. § 1329 because such

relief is a modification of the confirmed plan  . . . .  This means that, in accordance with §

1329(b)(1), he must file a Motion to Modify Plan, a Modified Plan, a new Plan Analysis, and a

current budget. . . . And, of course, he must send notice of the Motion to Modify Plan to all creditors,

the Standing Chapter 13 Trustee, and all other parties in interest." *In re Hansen*, 125 B.R. 831, 831-

32 (Bankr. D. Colo. 1991).

Even if a plan is modified in accordance with the statutory limitations of 11 U.S.C. § 1329,

"the court may, after  notice and a hearing, still disapprove that modification." *In re Klus*, 173 B.R.

51, 59 (Bankr. D. Conn. 1994); see *also In re Witkowski*, 16 F.3d 739, 746 (7th Cir. 1994) ("[A]ll

proposed modifications need not be approved and in practice not all modifications are approved.")

(citing *West v. Costen*, 826 F.2d 1376, 1379 (4th Cir.1987)).

On January 28, 2005, the Defendant mailed the Plaintiffs a letter offering them a Forbearance

Plan Agreement, but did not send a copy of this letter to the Plaintiffs' counsel or the Court.  On

February 3, 2005, without having consulted their counsel or receiving approval from the Court, the

Plaintiffs signed the Forbearance Agreement.  Although the Court has not yet seen a copy of the

Forbearance Agreement, the parties agree that its terms modify the terms of the Amended Plan.

In modifying the Amended Plan, the Defendant did not comply with any of the provisions

of § 1329. It did not notify the Court.  It did not notify the Plaintiffs' attorney.  It neither sought, nor

received the Court's approval.  It did not file a motion to modify the Amended Plan, the modified

---

[16] Although a modified plan becomes effective upon filing of a motion for modification pursuant to § 1329(b)(2), if the bankruptcy court, after hearing and notice, disapproves the modification, the plan reverts back to its *ex ante* terms, with all modifications nullified. *Meza v. Truman (In re Meza)*, 467 F.3d 874, 879 (5th Cir. 2006) (citing *In re Taylor*, 215 B.R. 882, 884 (Bankr. S.D. Cal. 1997)).

plan itself, a new plan analysis, or a current budget.  Moreover, as a secured creditor, the Defendant does not even have standing, pursuant to § 1329(a), to file a modified plan.  *Weber v. Heitkamp* (*In re Hopson*), 324 B.R. 284, 286-89 (S.D. Tex. 2005); *In re Arguin*, 345 B.R. 876, 880 (Bankr. N.D. Ill. 2006).  Therefore, to the extent that the Forbearance Agreement modifies the Amended Plan, the Defendant has violated the Court's order approving the Amended Plan, and the Defendant may be sanctioned for civil contempt.

The Court concludes that the Forbearance Agreement is an illegal modification of the Amended Plan and is invalid.  At present, the Court does not have sufficient evidence to determine the amount and nature of damages, or whether further sanctions should be imposed.  At trial, the Court needs to hear evidence about (1) the monetary damages the Plaintiffs suffered as a result of entering into the Forbearance Agreement; (2) the attorney's fees and costs the Plaintiffs incurred in contesting the Forbearance Agreement; (3) the contents of the Forbearance Agreement; and (4) how and why the Forbearance Agreement was negotiated, including but not limited to why the Defendant sent it to the Plaintiffs without informing the Plaintiffs' counsel or the Court.  With regard to the latter issue, the Court needs to hear what the Defendant knew and what it intended while negotiating the Forbearance Agreement.  The Court also needs to know whether entering into Forbearance Agreements under similar circumstances is the Defendant's regular practice, or if this was an isolated, unpleasant incident.

## I. The Defendant's purchase of the Plaintiffs' tax claims without this Court's approval

Bankruptcy Rule 3001(e)(2) states, in relevant part:

(2) Transfer of a Claim Other Than for Security After Proof Filed
    If a claim other than one based on a publicly traded note, bond, or debenture
    has been transferred other than for security after the proof of claim has been
    filed, <u>evidence of the transfer shall be filed by the transferee</u>. The clerk shall
    immediately notify the alleged transferor by mail of the filing of the evidence
    of transfer and that objection thereto, if any, must be filed within 20 days of

the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

FED. R. BANKR. P. 3001(e)(2) (2004) (emphasis added)

A creditor wishing to purchase another creditor's claims must do so in accordance with Bankruptcy Rule 3001(e). *In re Kreisler*, 331 B.R. 364, 376 (Bankr. N.D. Ill. 2005) (citing *In re Hoffman*, 98 B.R. 783, 784 (Bankr. S.D. Ohio 1989) ("[T]he purpose for the rule is to prevent the fraudulent transfer of claims for the purpose of receiving unwarranted dividends and the requirement must be fulfilled."). "Rule 3001(e)(2) is more than a simple housekeeping rule . . . . [F]ailure to file notice of transfer of claim is not a defect which can be cured." *Id.* (citing *In re Ellington*, 151 B.R. 90, 99 (Bankr. W.D. Tex. 1993)). "When a party fails to file a statement of transfer of claim, that party proceeds at its own risk." *In re Ellington*, 151 B.R. at 96.

"The use of the word 'shall' in Rule 3001(e)(2) indicates that Congress considered the filing of such notice to be mandatory." *Kreisler*, 331 B.R. at 376 (quoting *In re Wilson*, 96 B.R. 257, 261 (9th Cir. B.A.P. 1988)). The plain meaning of the word "shall" is mandatory, not advisory. *See Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

In March 2005, the Defendant paid delinquent property taxes on the Sanchez Property, without filing evidence of the payment and transfer with the Court. The Plaintiffs allege that the Defendant purchased pre-petition bankruptcy claims of taxing jurisdictions and, pursuant to Rule 3001(e)(2), was required to file notice of this transfer with the Clerk of Court. The Defendant contends that, pursuant to § 1322(b)(2), the Loan Documents give it the right to purchase tax claims on the Sanchez Property to protect its interest, and because § 1322(b)(2) controls, it is not required to file notice with the Court.

The Court does not need to reach whether § 1322(b)(2) gives the Defendant the right to protect its interest in the Sanchez Property by purchasing pre-petition tax claims. Even if the Defendant is so entitled, § 1322(b)(2) does not trump all other provisions of the Bankruptcy Code. Section 1322(b)(2) and Rule 3001(e)(2) can be easily harmonized. Requiring the Defendant to file a statement of transfer of claim with the Clerk does not modify or diminish the Defendant's rights pursuant to the Loan Documents.

The Defendant does not deny that it purchased the taxing authorities' claims without filing notice and, therefore, concedes it did not comply with Rule 3001(e)(2). Such failure to comply is a fatal defect. The Defendant's purchase of the tax claim is therefore invalid as to this Chapter 13 case.

The Court notes, additionally, that the facts in the record so far regarding the tax claims on the Sanchez Property are inconclusive and in some ways contradictory. The proofs of claim from Harris County/City of Houston and Houston ISD were for $4,003.60 and $4,575.20, respectively, and were for tax years 2001 and 2002. But in a letter dated May 9, 2005, AMC Mortgage Services[17] informed the Plaintiffs that with reference to the Sanchez Property, it had paid taxes of $9,540.32 (relating to Harris County) and $10,812.65 (relating to Houston ISD), and that both tax claims were from tax year 2001.

At trial, the Court would like to hear evidence on the specifics of the tax claims purchased by the Defendant, including the exact amounts, the tax years they relate to, and when they were purchased.

---

[17] AMC Mortgage Services, a former subsidiary of the Defendant, services loans for the Defendant.

### J. Injunction against the Defendant

The Fifth Circuit has recognized that § 105(a) grants bankruptcy courts the authority to grant injunctive relief. *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 523 (5th Cir.2004). "At common law, for a permanent injunction to issue the plaintiff must prevail on the merits of his claim and establish that equitable relief is appropriate in all other respects." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). A party seeking a permanent injunction must plead and prove an irreparable injury for which there is no adequate remedy at law. *Lewis V. S.S. Baune*, 534 F.2d 1115, 1123-24 (5th Cir. 1976). In the context of injunctive relief, an adequate remedy at law exists if the situation to be enjoined can be remedied by legally measurable damages. *Dresser-Rand*, 361 F.3d at 848 (citing *Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728, 730 (Tex.App.-Corpus Christi 1996, writ dism'd w.o.j.)).

In their complaint, the Plaintiffs request an injunction against the Defendant to prevent the Defendant from assessing and collecting fees without disclosing them or receiving the Court's approval. The Defendant's unreasonable charges and the attorney's fees the Plaintiffs have incurred are legally measurable damages, and not suitable for injunctive relief. However, the Defendant's actions also subject it to civil contempt, for which the Court may use its equitable powers under § 105(a) to issue sanctions. These sanctions are equitable and, by definition, not legally measurable. The Defendant repeatedly and intentionally acted in violation of this Court's orders and the automatic stay, and injunctive relief is necessary. The Court hereby grants the Plaintiffs' injunction.

### K. The Plaintiffs' objection to claim pursuant to 11 U.S.C. § 502(b) and (j)

Section 502(b) of the Bankruptcy Code states that, discounting exceptions not relevant to the instant case:

Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . .

Section 502(j) states:

A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

The Plaintiffs allege that the Defendant's proof of claim was overstated in that it failed to take into account monies held in a so-called "Suspense Account" that were later used to pay for pre-petition arrearages. The Plaintiffs further allege that they could not have objected to the Defendant's claim before confirmation of the Amended Plan because they did not know about the Defendant's use of Suspense Accounts.

The Defendant seems to contend that whether or not it used Suspense Accounts, the plain language of § 1327(a) and res judicata prevent the Plaintiffs from objecting to its proof of claim. As previously discussed in this opinion, res judicata will not have a preclusive effect on a confirmed plan if predicate steps required by the Code or Bankruptcy Rules were not followed, *see In re National Gypsum Co.*, 208 F.3d 498, 514 (5th Cir. 2000), or if doing so would result in a denial of due process. *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993).

In the instant case, the Court does not have enough evidence about the use and purpose of the Defendant's Suspense Accounts to determine whether the Defendant has violated §§ 502(b) and/or (j). At trial, the Court would like to hear evidence on (1) the Defendant's use of Suspense

40

Accounts; (2) how the Defendant employed a Suspense Account with regard to the Plaintiffs; (3) whether the Defendant's proof of claim was overstated by failing to offset the arrearage by the amount of the Suspense Account; and (4) whether this accounting practice is unique to the Plaintiffs or common to all similarly situated borrowers.

### L. Additional matters to be addressed at trial

As the Plaintiffs may recover all of the unreasonable charges assessed by the Defendant, the Court needs to see a complete and accurate accounting of all charges assessed or collected by the Defendant with respect to the Plaintiffs, with particular emphasis on the undisclosed attorney's fees, costs, and property inspection fees. Additionally, since the Defendant must return the unreasonable fees and costs, and the Forbearance Agreement has been judged invalid, the Court would like the Defendant to file an amended claim describing in clear detail what, exactly, the Plaintiffs owe. The Court emphasizes that at present, the Amended Plan is the only enforceable contract governing the relationship between the Plaintiffs and the Defendant.

## IV. Conclusion

Congress created Chapter 13 of the Bankruptcy Code to "address consumer credit loss during the Great Depression by providing a completely voluntary proceeding for consumers to amortize their debts out of future earnings." *In re Meza*, 467 F.3d 874, 877 (5th Cir. 2006) (quoting *In re Nolan*, 232 F.3d 528, 530 (6th Cir. 2000)). Chapter 13 permits wage-earning debtors "to reorganize with a repayment plan as an alternative to seeking a complete discharge of debts through the Chapter 7 bankruptcy liquidation process." *Id.* With the purpose of granting a fresh start to the "honest but unfortunate debtor," the Chapter 13 process "authorizes an individual with regular income to obtain a discharge after the successful completion of a payment plan approved by the bankruptcy court." *Marrama*, 127 S.Ct. at 1107.

In the instant case, the Defendant has acted in a way antithetical to both the letter and spirit of the Bankruptcy Code. The Court would like to be very clear: a creditor holding a lien on a debtor's homestead may not assess a debtor post-petition charges without giving notice to the debtor and without seeking court approval, whether or not those charges are specifically allowed under a pre-petition contract. Nor may such a creditor purchase another creditor's claim without notifying the Court, or modify a confirmed plan.[18] To hold otherwise would be to prefer one creditor over others, and deny Chapter 13 debtors the chance for a fresh start—thereby upending the twin pillars of the bankruptcy system.[19]

For the reasons set forth above, this Court grants the Plaintiffs' Motion for Partial Summary Judgment and denies the Defendant's Motion for Summary Judgment.

---

[18] As an oversecured creditor, the Defendant does not even have standing to file a motion for modification of the Amended Plan. 11 U.S.C. § 1329.

[19] "[T]he laws and jurisprudence of bankruptcy note often that there are two competing goals of bankruptcy and reorganization. One is the satisfaction of valid claims against the estate. The other is to allow the debtor a 'fresh start' in the marketplace." *In re Ortiz*, 2006 WL 2946500, at *9 (quoting *In re T-H New Orleans Ltd. P'ship*, 188 B.R. at 807)

A separate order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Memorandum Opinion.

Signed on this 24th day of July, 2007.

Jeff Bohm
U.S. Bankruptcy Judge